**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

DANIELLE D.,

*Plaintiff,*

Case No. 1:25-cv-13701

*v.*

Patricia T. Morris
United States Magistrate Judge

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_________________________________/

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 15, 16)**

## I. CONCLUSION

For the reasons set forth below, Plaintiff Danielle D.'s motion for summary judgment will be **DENIED** (ECF No. 15), Defendant the Commissioner of Social Security's motion for summary judgment will be **GRANTED** (ECF No. 16), and the final decision of the Administrative Law Judge (ALJ) will be **AFFIRMED**.

## II. DISCUSSION

### A. Introduction and Procedural History

In September 2023, Plaintiff applied for supplemental security income and child's insurance benefits based on disability, alleging she became disabled on September 16, 2021. (ECF No. 7-1, PageID.34). The Commissioner initially denied

Plaintiff's applications on January 24, 2024, and on reconsideration on May 28, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on January 8, 2025. (*Id.* at PageID.53–80). The ALJ issued a written decision on January 28, 2025, finding Plaintiff was not disabled. (*Id.* at PageID.31–52). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on September 24, 2025. (*Id.* at PageID.21–25).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on November 19, 2025. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 9). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 15, 16).

**B. Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is

not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

**C. Framework for Disability Determinations**

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he

or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

Before reaching step one, the ALJ noted that Plaintiff had not yet turned 22 by her alleged onset date of September 16, 2021.[1] (ECF No. 7-1, PageID.36). At

[1] "Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is 18 years old or older and has a disability that began before attaining age 22 (20 CFR 404.350(a)(5))." (ECF No. 7-1, PageID.35).

step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (*Id.*).

At step two, the ALJ found the following severe impairments: post-traumatic stress disorder (PTSD); bipolar disorder; generalized anxiety disorder; panic disorder; social anxiety disorder; and persistent depressive disorder. (*Id.* at PageID.37). At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.38).

Next, the ALJ found Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: she can understand, remember, and apply simple instructions; she can concentrate, persist, or remain on pace while doing simple routine tasks; she can have no fast-paced production work, such as assembly line work or work with hourly quotas or work where her pace affects the work pace of others, but she can complete end of day production requirements; she cannot perform tandem tasks; she can have little to no change in the work setting or routine; she can occasionally interact with coworkers; and she can have no interaction with the public.

(*Id.* at PageID.41).

At step four, the ALJ found that Plaintiff had no past relevant work. (*Id.* at PageID.46). However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.*). Specifically, the ALJ found Plaintiff could perform the requirements of an assembler (100,000 jobs in the national economy), an inspector (30,000), and an inspector/packer (25,000). (*Id.*). Thus, the ALJ

concluded Plaintiff was not disabled. (*Id.* at PageID.47).

### E. Administrative Record

After reviewing both parties' motions, the Court has determined that Plaintiff's arguments will be separated into the following three issues: whether the ALJ erred when (1) evaluating medical opinions; (2) evaluating Plaintiff's subjective symptoms; and (3) crafting the RFC. While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's arguments on appeal.

Plaintiff alleges disability beginning on September 16, 2021. Approximately six months prior, Plaintiff's primary care provider (PCP) diagnosed her with panic disorder and prescribed buspirone to manage her symptoms. (ECF No. 7-1, PageID.446, 448).

It does not appear Plaintiff sought mental health services until August 2023, when she began receiving services from St. Clair County Community Mental Health. (*See, e.g.*, *id.* at PageID.492). During her psychiatric diagnostic evaluation, Plaintiff reported panic attacks, depression, and childhood trauma. (*Id.* at PageID.505–06). She presented well groomed, appropriately dressed, and with good hygiene. (*Id.* at PageID.510). Plaintiff was talkative, though sometimes guarded when providing information, and fidgeted throughout the evaluation; but she "answered questions verbally and spoke clearly. She made appropriate eye contact throughout as well. She understood verbal communication given to her by clinician as well." (*Id.* at

PageID.511). Her "mood was anxious overall and also irritable at times." (*Id.*). Plaintiff's affect, thought process, and thought content were all normal and she was alert and oriented x3. (*Id.* at PageID.512). She reported decreased concentration, appetite, and energy and also that "she gets along with others 'decently.'" (*Id.* at PageID.512–13). The clinician diagnosed her with generalized anxiety disorder with panic attacks, major depressive disorder, and PTSD. (*Id.* at PageID.513).

After intake, it was noted:

> [Plaintiff] was informed of all CMH services and she chose to have supports coordination. [Plaintiff] will utilize her strengths to assist her in meeting her goals of figuring out her allergies and getting on disability so that she can meet her dreams. Her social support network of her fiancé will assist [her] in maintaining these outcomes so that she may move to her PCP prescribing medications or to a community provider for some mental health services if requested and based on medical necessity. This service will occur via outpatient services, which are the least restrictive services at this time to meet the needs that [Plaintiff] experiences. Medical necessity will be re-evaluated.

(*Id.* at PageID.501). Clinical services were added on September 21. (*Id.* at PageID.493).

In October 2023, Plaintiff's mother completed a third-party function report wherein she explained that Plaintiff "has memory issues, and problems with emotional regulation which limits her ability to maintain a steady job. Her PTSD is triggered easily especially in an environment that involves working with the public." (*Id.* at PageID.252). Plaintiff's mother also described problems with Plaintiff's management of her personal care, including dressing, bathing, and caring for her

hair. (*Id.* at PageID.253). She noted that Plaintiff relied on alarms to take her medication, could complete laundry and light chores throughout the course of a day, and only prepared meals that were "[a]s simple as possible." (*Id.* at PageID.254). Plaintiff preferred to "avoid[] public places and social events for the most part" and usually only left home to shop or attend doctor's appointments. (*Id.* at PageID.256).

On January 5, 2024, Plaintiff underwent a mental status evaluation with Terry Rudolph, Ph.D., licensed psychologist. (*Id.* at PageID.573). Plaintiff reported: "'I have PTSD and it causes me to have trouble taking care of myself, remembering things and going out in public. I have an exaggerated startle response.'" (*Id.*). Dr. Rudolph noted that Plaintiff was alert, well oriented, polite, and cooperative with spontaneous, well-organized, and detailed speech. (*Id.* at PageID.574). Her "emotional reaction was euthymic and matter of fact." (*Id.*). Dr. Rudolph reached the following conclusions:

> [Plaintiff] is a 21 year old female who was referred for psychological evaluation pursuant to her claim for Social Security Disability Benefits. [Plaintiff] alleges Disability Due To: PTSD. She relates that her PTSD is due to her parents [sic] drug and alcohol use and physical and emotional abuse by her stepfather. [Plaintiff] has never been psychiatrically hospitalized but she is in outpatient mental health treatment. She is prescribed Propranolol, but was on other psychotropic medications in the past. [Plaintiff] related a history of cutting herself, but she has not done that for several years. She attended school until the 10th grade and completed a GED. [Plaintiff] has worked in fast food and retail with her longest job lasting about 3 months. She described having a constricted social network and range of activities.

> [Plaintiff] was alert, verbal and oriented fully to person and place and generally to time. Her memory immediate was in the low average range and her fund of general information was intact. [Plaintiff's] delayed memory was impaired. She was generally able to perform mental arithmetic. [Plaintiff's] interpretation of proverbs was superficial and her reasoning was literal and concrete. Her formal judgment was adequate.
>
> [Plaintiff] may have difficulty meeting and interacting with the public but she should be able to get along with supervisors and coworkers. She may not be able to register, recall, and carry out one step and simple two step directions. [Plaintiff] would benefit from communications that are simple, direct and concrete in an effort to compensate for her weakness in abstract verbal reasoning. She would benefit from a structured work environment with a finite and well defined set of job duties and frequent supervision and feedback. This will help compensate for her limited vocational experience and minimize the need to problem solve or make decisions in the workplace. [Plaintiff] should be able to maintain attention and concentration for extended periods. It may be difficult for her to work in coordination with or in close proximity to others without being distracted by them. [Plaintiff] should be able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.

(*Id.* at PageID.575).

The next month, Plaintiff told her PCP that "[s]he is currently seeing a therapist for depression and PTSD. She has tried multiple medications in the past and doesn't tolerate them well, she is interested in genetic testing but the psychiatrist who works with her therapist doesn't do the genetic testing." (*Id.* at PageID.581). Plaintiff's PCP "[e]xplained that genetic testing is not current[ly] evidence based medicine so I do not order it." (*Id.*).

On July 24, 2024, Plaintiff's treating therapist, Emma Purdy, LLMSW,

completed a mental impairment questionnaire. (*Id.* at PageID.597–603). She had been seeing Plaintiff on a biweekly basis for approximately seven months. (*Id.* at PageID.597). Plaintiff's symptoms included "[g]eneralized and excessive worrying, restlessness, fatigue, difficulty concentrating, irritability, loss of interest/motivation, feelings of worthlessness, hypervigilance, memory issues, exaggerated startle reflex, avoidance of internal/external stimuli, [and] panic attacks." (*Id.*). Purdy further explained that she has observed Plaintiff's "inconsistent symptoms which can leave her unaware of how a day will progress. She is unable to predict them due to their inconsistency and is not always able to cope with them in the moment." (*Id.* at PageID.598).

Purdy rated Plaintiff as precluded from performing the following activities: maintaining attention and concentration, being able to attend work regularly, working around others without being unduly distracted, being able to work without frequent breaks, getting along with the public, and dealing with even minimal changes in work or work setting. (*Id.* at PageID.600–01). She rated Plaintiff as limited but not precluded from the following: remembering work-like procedures, understanding and remembering simple instructions, carrying out short, simple instructions, accepting instructions and responding appropriately, getting along with coworkers, and getting along with supervisors. (*Id.*). These ratings were based in part on Purdy's clinical judgment and her observations that Plaintiff "frequently

struggles with being around other people in the waiting room and with maintaining concentration during clinical sessions." (*Id.* at PageID.601).

As for the four broad areas of functioning, Purdy opined Plaintiff had no limitations in understanding, remembering, or applying information; marked limitations in interacting with others; extreme limitations in concentrating, persisting or maintaining pace, and moderate limitations in adapting or managing herself. (*Id.* at PageID.602). Purdy estimated that Plaintiff would miss up to 25% of workdays due to her symptoms. (*Id.*).

In August 2024, Plaintiff underwent an annual assessment with St. Clair County Community Mental Health. (*Id.* at PageID.637). She presented well groomed, appropriately dressed, and with good hygiene. (*Id.* at PageID.643). Plaintiff "answered questions verbally and spoke clearly. She made appropriate eye contact throughout as well. She understood verbal communication given to her by clinician as well. [Plaintiff] verbalizes that she is uncomfortable with eye contact, but does maintain it intermittently." (*Id.*). Plaintiff's mood was anxious with a congruent affect, she had normal thought process and content, and was alert and oriented x3. (*Id.* at PageID.644). Plaintiff reported impaired concentration and ability to interact socially as well as decreased appetite and energy. (*Id.* at PageID.644–45). Plaintiff's diagnoses were revised to PTSD, Bipolar II disorder, generalized anxiety disorder, panic disorder, and social anxiety disorder. (*Id.* at

PageID.645).

On October 14, 2024, Plaintiff reviewed her genetic testing results with her psychiatric provider. (*Id.* at PageID.616). Based on the results and Plaintiff's desire for medication to help with mood stability, the provider prescribed Trileptal 150mg. (*Id.*). Later that month, Plaintiff met her health mentor by the river in St. Clair and when "asked if she gets out much to go downtown," Plaintiff "stated that she stays home most of the time. [Plaintiff] would like to meet at the Y[MCA] for her next session. [Health mentor] will meet with her outside the Y and walk in with her to help ease her social anxiety." (*Id.* at PageID.673).

At the January 8, 2025 hearing, Plaintiff testified that she lived in a trailer with her boyfriend, her sister, her sister's boyfriend, and a roommate. (*Id.* at PageID.60). On a typical day, Plaintiff woke up, took her medication, ate breakfast, and then spent the day at home watching TV or listening to music. (*Id.* at PageID.65). She was able to independently manage her personal care, make simple meals, and perform household chores, including washing dishes and sweeping. (*Id.* at PageID.66–67). She was also responsible for feeding her two cats, but her boyfriend otherwise handled their care. (*Id.* at PageID.61). Plaintiff never obtained a driver's license because driving causes her to hyperventilate. (*Id.* at PageID.66).

Plaintiff explained that she was unable to work because "[t]he symptoms that [she] experience[s] make it very difficult to leave [her] house and function overall.

[She] ha[s] panic attacks from [her] PTSD with tremors." (*Id.* at PageID.63). Her panic attacks were triggered by "[b]eing in public spaces; loud noises; conflicts with other people, or perceived conflicts with other people; and unpredictability, very, like, rapid changes; things like that." (*Id.*). Plaintiff could only concentrate on a task for up to five minutes before she needed reminded to get back on-task. (*Id.* at PageID.67–68). She had trouble keeping plans with others and liked to isolate in her bedroom. (*Id.* at PageID.68–69). At the time of the hearing, Plaintiff was not taking any medications for her mental impairments because of her past adverse reactions to several prescriptions. (*Id.* at PageID.65–66).

In 2021, Plaintiff worked at a Subway for approximately three months before she "had a panic attack and . . . was hyperventilating into a paper bag. And . . . it got very difficult and [she] just decided [she] was unable to continue." (*Id.* at PageID.62–63). In 2023, Plaintiff worked at a McDonald's for a week before having to quit due to panic attacks. (*Id.* at PageID.62). On her last day at McDonald's, Plaintiff "was being trained, and the person that was training [her] told [her] that [she] did something incorrectly, because [she] couldn't remember. And [she] just started hyperventilating and [she] ran to the bathroom." (*Id.* at PageID.63–64).

Further facts will be discussed as necessary below.

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability

decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i) A licensed or certified psychologist at the independent practice level; or

(ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative

medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id.* § 404.1520c(c)(3). This factor includes analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the

> claimant's] impairment(s);
>
> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the

claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of

this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or

decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant has] a severe impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability

> continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought,

memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant

is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

> (i) [D]aily activities;
>
> (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;
>
> (vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or,

if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G. Argument and Analysis

As stated above, the Court has broken Plaintiff's arguments into the following three issues: whether the ALJ erred when (1) evaluating medical opinions; (2) evaluating Plaintiff's subjective symptoms; and (3) crafting the RFC.

#### 1. Evaluation of Medical Opinions

Plaintiff argues the ALJ erred when she rejected Dr. Rudolph's and Purdy's opinions that Plaintiff is unable to work alongside coworkers without getting

distracted. She also argues the ALJ erred by rejecting Dr. Rudolph's opinion that Plaintiff needs a structured work environment.

As a refresher, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain her approach with respect to supportability and consistency when considering a medical opinion. *Id.* § 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). Importantly,

> The new regulation substantially reduces the ALJ's obligation to explain the basis for his or her assessment of medical opinions:
>
> > [Source-level articulation.] Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the

> medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept. 28, 2023) (quoting 20 C.F.R. § 404.1520c(b)(1)); *see also Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. 2022) ("Even for a medical opinion, there is no requirement to cite to every piece of evidence or conclusion.").

The ALJ thoroughly discussed the medical opinions of record. Beginning with Dr. Rudolph's, the ALJ wrote:

> After his examination, Dr. Rudolph offered the following opinion of claimant's work limitations:
>
>> 1) [Plaintiff] may have difficultly [sic] meeting and interacting with the public, but she should be able to get along with supervisors and coworkers.
>>
>> 2) She may not be able to register, recall, and carry out one step and simple two step directions.
>>
>> 3) [Plaintiff] would benefit from communications that are simple, direct, and concrete to compensate for her weakness in abstract verbal reasoning.
>>
>> 4) She would benefit from a structured work environment with a

> finite and well-defined set of job duties and frequent supervision and feedback. This will help compensate for her limited vocational experience and minimize the need to problem solve or make decisions in the workplace.
>
> 5) [Plaintiff] should be able to maintain attention and concentration for extended periods.
>
> 6) It may be difficult for her to work in coordination with or in close proximity to others without being distracted by them.
>
> 7) [Plaintiff] should be able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness (12F/3).

This opinion is somewhat persuasive. First, except for indicating her weakness in abstract verbal reasoning (3), Dr. Rudolph did not <u>support</u> his opinion with any objective medical evidence. Although one may infer he based his opinion on the results of his examination, he does not specifically indicate what findings in the examination led to a particular conclusion.

Second, the doctor indicates he opines claimant would need a structured work environment (4) due to her limited vocational experience, however, her vocational experience should not be a consideration in assess[ing] functional work limitations. *See*, SSR 96-8p ([I]n assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments). Next, much of the doctor's language does not convey the most claimant can do in an ordinary work setting. *See*, SSR 96-8p. Rather, language such as "may have difficulty" or "may not be able to" or "would benefit", indicate possible limitations or an ideal work setting. Additionally, much of Dr. Rudolph's limitations use non-vocationally defined language, such as "simple, direct, and concrete communications" and "structured work environment."

Not only does Dr. Rudolph fail to support his limitations regarding claimant's ability [to] register, recall, and carry out simple directions, but such limitations are not consistent with the medical evidence. At the examination, claimant could do simple computations, could recall 5 digits forward and 3 backwards. The examiner noted she was polite

> and cooperative, as well as well-organized and detailed in her presentation. He estimated her intelligence as low average, and her fund of information was intact. Further, claimant completed a GED and took some community college classes. The record also does not support the assertion claimant would be distracted by her coworkers. Nonetheless, the overall medical record does support claimant's mental impairments would limit her to simple instructions and simple tasks, with additional limits on social interactions.

(ECF No. 7-1, PageID.43–44).

The ALJ then compared Dr. Rudolph's opinion to those of the agency reviewers. On initial review, the agency psychologist opined that Plaintiff had no limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting or maintaining pace; and mild limitations in adapting or managing herself. (*Id.* at PageID.86). The reviewer also noted: "[Claimant] retains the ability to perform simple tasks on a sustained basis w[ith] incidental public contact." (*Id.* at PageID.89). The psychological reviewer on reconsideration largely agreed with the initial reviewer:

> In summary, previous rationale and associated evidence from 1/24/24 is persuasive, consistent and supportable. Additionally, new evidence was provided, but is consistent with the previous evidence and ultimate determination. As such, it is relevant, but didn't support significant improvement or worsening in claimant's condition as previously reported. [Claimant] remains capable of simple, routine tasks in a low stress setting requiring no more than occasional interaction with others.

(*Id.* at PageID.105). He agreed with the ratings for three of the four broad areas of functioning, but opined that Plaintiff had moderate, rather than mild, limitations in

adapting or managing herself. (*Id.*).

The ALJ found these opinions somewhat persuasive. However, in part due to Dr. Rudolph's opinion, the ALJ reasoned that Plaintiff was moderately limited in *all four* broad areas of functioning. (*Id.* at PageID.44). Accordingly, the ALJ added additional restrictions to the RFC, specifically

> she can have no fast-paced production work, such as assembly line work or work with hourly quotas or work where her pace affects the work pace of others, but she can complete end of day production requirements; she cannot perform tandem tasks; she can have little to no change in the work setting or routine; she can occasionally interact with coworkers; and she can have no interaction with the public.

(*Id.* at PageID.41, 44).

The ALJ next turned to Purdy's opinion, summarizing it as follows:

> The aforementioned mental impairment questionnaire completed by the claimant's therapist, Emma Purdy, L.L.M.S.W., in July 2024 also included the following information: her symptoms will constantly prevent her from focusing on even a simple job based on PTSD symptom screening with the PCL-5, depression screening with the PHQ-9, a level of care utilization services (LOCUS) tool, her biopsychosocial assessment, and observation of inconsistent symptoms, which can leave her unaware of how a day will progress as she is unable to predict them due to their inconsistency and is not always able to cope with them in the moment, but she would not need reminders to return to task during a work day, even while performing simple tasks or unskilled work; she had mild or no limitations with understanding, remembering, or applying information; her symptoms would cause her to miss at most 1/4 of the days from work; and she could manage benefits in her own interest (15F).

(*Id.* at PageID.45). The ALJ reasoned that

> [t]he evidence of record does document some variability in symptoms

> as she told a psychiatric nurse practitioner she felt very low and suppressed when her therapist completed that questionnaire, but her mood was good about a week later when she had a euthymic affect on mental status exam even though she said her anxiety was always higher in doctors offices (17F). It therefore does not logically follow that her symptoms would constantly prevent her from focusing on even a simple job and a conclusion that she is precluded from maintaining attention and concentration is internally inconsistent with the assessment that she would not need reminders to return to task during a work day, even while performing simple tasks or unskilled work and is inconsistent with other evidence such as Dr. Rudolph's prior medical opinion that she should be able to maintain attention and concentration for extended periods in addition to subsequent psychiatric nurse practitioner mental status exam findings that she did not appear to be distracted or distant (12F, 15F, and 17F). To the extent Ms. Purdy's medical opinion is somewhat supported by observations of frequent struggles with being around other people in the waiting room and with maintaining concentration during clinical sessions, I have limited her to simple routine tasks and restricted her from fast-paced production work, tandem tasks, interacting with the public, having more than little change in the work setting or routine, and having more than occasional interaction with co-workers, but other conclusions about being precluded from being at work regularly, working around others without being unduly distracted, working without frequent breaks, and dealing with even minimal changes in the work or work setting are not consistent with the overall record or more recent evidence that generally documents further improvement with treatment to the extent she has been meeting in public places with her health mentor on a fairly regular basis so these portions are not persuasive (3A, 4A, 5A, 6A, 8F, 9F, 11F, 12F, 13F, 14F, 15F, 17F, and 18F).

(*Id.*).

Plaintiff argues the ALJ erred when rejecting Dr. Rudolph's opinion that Plaintiff could not work in close proximity to others. More specifically, she argues that the ALJ's "conclusory explanation does not permit meaningful review because the ALJ failed to identify what evidence purportedly contradicted this limitation."

(ECF No. 15, PageID.715). This argument misunderstands the ALJ's analysis.

The ALJ explained that "[t]he record also does not support [Dr. Rudolph's] assertion claimant would be distracted by her coworkers." (ECF No. 7-1, PageID.44). In context, this statement means that there was *no* evidence in the record on this issue. While Plaintiff points to Purdy's opinion as evidence that Plaintiff would be distracted by coworkers, the ALJ also directly addressed this, as quoted above. (*Id.* at PageID.45). In other words, the ALJ found there was no objective medical evidence supporting either Dr. Rudolph's or Purdy's opinions that Plaintiff would be unable to focus around coworkers. She cannot cite what does not exist.

While there certainly is objective evidence that Plaintiff has difficulty being in public and interacting with customers, the Court's review of the medical records confirms the ALJ's finding that the same cannot be said for Plaintiff's alleged limitations in interacting with coworkers. Therefore, the ALJ did not err when she rejected Dr. Rudolph's and Purdy's opinions that Plaintiff was unable to work with coworkers and her decision to do so is supported by substantial evidence.

As to Plaintiff's argument that the ALJ erred by rejecting Dr. Rudolph's opinion that she required a structured work environment, the Commissioner correctly responds that Dr. Rudolph did not so opine. Instead, he opined that Plaintiff "*would benefit* from a structured work environment with a finite and well

defined set of job duties and frequent supervision and feedback. This *will help* compensate for her limited vocational experience and minimize the need to problem solve or make decisions in the workplace." (*Id.* at PageID.575 (emphasis added)). Dr. Rudolph's language does not suggest Plaintiff requires a structured work environment, but rather that one would be ideal for her.

Moreover, the ALJ correctly identified several problems with Dr. Rudolph's opinion, including his use of phrases like "would benefit" and "may have difficulty" as well as his use of "non-vocationally defined language." (*Id.* at PageID.44). An ALJ evaluates medical opinions in order to craft the RFC finding. And "[a]n RFC is 'the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'" *Bennett v. Comm'r of Soc. Sec.*, No. 3:25-CV-02075, 2026 WL 1967218, at *8 (N.D. Ohio July 8, 2026) (quoting SSR 96-8p, 1996 WL 374184, at *2), *report and recommendation adopted*, 2026 WL 2529391 (N.D. Ohio Aug. 27, 2026). Dr. Rudolph's use of phrases like "would benefit" and "may have difficulty" suggests that he was opining about the ideal work environment for Plaintiff, rather than opining on her maximum abilities. Finally, "an opined limitation not being in vocationally relevant terms is reason to reject that limitation." *Culbertson v. Comm'r of Soc. Sec.*, No. 1:24-CV-01847, 2026 WL 696554, at *6 (N.D. Ohio Mar. 12, 2026).

In sum, the ALJ thoroughly evaluated the medical opinions of record. She

followed the relevant regulations and supported her findings with substantial evidence. Therefore, the ALJ's evaluation of the medical opinions will be affirmed.

**2. Evaluation of Plaintiff's Subjective Symptoms**

Plaintiff also argues the ALJ erroneously discounted Plaintiff's subjective symptoms. According to SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with other record evidence, considering her testimony about pain or other symptoms with the rest of the relevant evidence in the record and other factors. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility," as long as the assessment is supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also Saunders v. Kijakzi*, No. 20-cv-12210, 2022 WL 885838, at *3 (E.D. Mich. Mar. 25, 2022) ("'It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant'" (quoting *Rogers.*, 486 F.3d at 247)).

The regulations establish a two-step process for evaluating subjective

symptoms, including pain. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029, at *2; *Stanley v. Sec'y of Health & Hum. Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6.

Here, the ALJ properly stated the above-standard then discussed both Plaintiff's testimony and the record evidence. (ECF No. 7-1, PageID.41–43). The ALJ's summation of the record is consistent with the Court's, *supra* subsection E. The ALJ concluded:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record, which generally documents improvement in mental health when she engages in treatment to the extent she has recently been meeting in public places with her health mentor on a fairly regular basis (8F, 9F, 13F, 14F, 17F, and 18F). To avoid unnecessary exacerbation of her symptoms, I have precluded her from fast-paced production work, tandem tasks, interacting with the public, and more than little change in the work setting or routine, but the overall evidence of record indicates she has been capable of performing simple routine tasks by understanding, remembering, and applying simple instructions to

> complete end of day production requirements and have occasional interaction with co-workers despite her moderate mental functioning limitations since the alleged onset date (3A, 4A, 5A, 6A, 1E, 4E, 8F, 9F, 10F, 11F, 12F, 13F, 14F, 15F, 16F, 17F, and 18F).

(*Id.* at PageID.43).

Plaintiff contends that "[r]ather than meaningfully addressing this evidence, the ALJ focused primarily on isolated observations that [she] was cooperative during appointments and occasionally engaged in limited supported outings with a health mentor." (ECF No. 15, PageID.719). However, the ALJ acknowledged that "[t]he evidence of record does document some variability in symptoms." (ECF No. 7-1, PageID.45). The record also documents that Plaintiff lives in a trailer with her boyfriend, her sister, her sister's boyfriend, and a roommate (*id.* at PageID.60) and she did not testify to any difficulty getting along with them. Similarly, she regularly speaks to and sees her mother (*id.* at PageID.252) and has become comfortable enough with her health mentor to explore public places with her support (*id.* at PageID.673). *See, e.g.*, *Simpson v. Comm'r of Soc. Sec.*, No. 14-cv-74420, 2016 WL 74420, at *10 (S.D. Ohio Jan. 6, 2016) ("Evidence showing that plaintiff attended movies with family and friends, visited friends, participated in fundraising for school, dined out, performed household chores such as cooking and vacuuming, drove on a daily basis, went shopping, and traveled significant distances for vacation casts doubt on her assertions of debilitating pain and mental impairments."), *report and recommendation adopted*, 2016 WL 1223007 (S.D. Ohio Mar. 29, 2017). The

ALJ appropriately considered this evidence when analyzing Plaintiff's subjective reports of symptoms.

Further, Plaintiff's testimony about her history of panic attacks while working service jobs supports the ALJ's implicit finding that the primary trigger for these panic attacks was interacting with members of the public rather than merely working with others. The ALJ accounted for this finding by incorporating additional restrictions in the RFC, including that Plaintiff cannot work with the public. (ECF No. 7-1, PageID.43 ("To avoid unnecessary exacerbation of her symptoms, I have precluded her from fast-paced production work, tandem tasks, interacting with the public, and more than little change in the work setting or routine, but the overall evidence of record indicates she has been capable of performing simple routine tasks by understanding, remembering, and applying simple instructions to complete end of day production requirements and have occasional interaction with co-workers despite her moderate mental functioning limitations since the alleged onset date.")).

Ultimately, "an ALJ's decision 'must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.'" *Murray v. Comm'r of Soc. Sec.*, No. 17-cv-12586, 2018 WL 836480, at *3 (E.D. Mich. Feb. 13, 2018) (quoting SSR 16-3p, 2016 WL 1119029, at *9). The ALJ's decision here

satisfies these criteria and is supported by substantial evidence. Accordingly, Plaintiff's challenge to the ALJ's evaluation of her subjective symptoms is unavailing.

### 3. RFC Finding

Finally, Plaintiff argues that the RFC "omitted significant limitations relating to attendance, persistence, stress tolerance, coworker proximity, and the ability to sustain work activity on a regular and continuing basis" and "the decision does not adequately explain how [Plaintiff] can sustain competitive employment despite consistent evidence documenting panic-triggered dysfunction, concentration deficits, social overstimulation, and difficulty tolerating ordinary workplace demands." (ECF No. 15, PageID.711).

"In making an RFC determination, an ALJ must evaluate the medical opinions in the record and determine their persuasiveness." *Culbertson*, 2026 WL 696554, at *5. However, the relevant regulations imbue an ALJ "with discretion when formulating the RFC and [an ALJ] need not use the exact language of various medical opinions in the record when describing a claimant's abilities." *Stephen D. v. Comm'r of Soc. Sec.*, 734 F. Supp. 3d 729, 741 (S.D. Ohio 2024). Ultimately, if an "ALJ has undertaken a procedurally proper review of the medical records in formulating the RFC and the challenge is to the substance of the ALJ's formulation after that procedurally proper review, the bar for any such challenge is high, and it

is the claimant's burden to meet it." *Id.*

As explained above, the ALJ performed a procedurally proper review. She thoroughly evaluated the opinions of Dr. Rudolph, Purdy, and the agency reviewers, finding all somewhat persuasive. Her evaluations referenced relevant medical records, testimony, and function reports. The ALJ used the medical opinions to find that Plaintiff had moderate limitations in all four broad areas of functioning. As a result of these limitations, the ALJ added additional restrictions to the RFC:

> she can understand, remember, and apply simple instructions; she can concentrate, persist, or remain on pace while doing simple routine tasks; she can have no fast-paced production work, such as assembly line work or work with hourly quotas or work where her pace affects the work pace of others, but she can complete end of day production requirements; she cannot perform tandem tasks; she can have little to no change in the work setting or routine; she can occasionally interact with coworkers; and she can have no interaction with the public.

(*Id.* at PageID.41). The Court can follow the ALJ's reasoning and her decision to include many non-exertional limitations demonstrates that she considered the evidence Plaintiff now relies on and used that evidence when crafting the RFC. *Cf. Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023) ("Showalter faults the ALJ for not explicitly acknowledging that some of her activities were limited. But the ALJ explained that 'after careful consideration of the entire record' he found that Showalter had 'some significant limitations due to her impairments, such that she should avoid heavier lifting, reaching overhead, and working around hazards and irritants.' In other words, he considered the evidence

of her limitations and tailored her residual functional capacity accordingly." (citation modified)).

"Because the ALJ's description of a claimant's RFC is a finding of fact," Plaintiff "must show that the ALJ's explanation is *wrong* (such that it could not be supported by substantial evidence) rather than simply *different* from the medical opinion." *Stephen D.*, 734 F. Supp. 3d at 742 (emphasis in original). Plaintiff has not made this showing. Moreover, "[a]n ALJ's more restrictive finding than that of the state agency physician's may be len[t] as support for the ALJ's finding." *McCoy v. Kijakazi*, No. 21-11739, 2023 WL 3407159, at *7 (E.D. Mich. Feb. 27, 2023), *report and recommendation adopted sub nom. McCoy v. Comm'r of Soc. Sec.*, 2023 WL 3147899 (E.D. Mich. Apr. 28, 2023). Here, the ALJ made more restrictive findings than either of the agency reviewers. For these reasons, the ALJ's RFC finding is supported by substantial evidence and therefore will be affirmed.

## III. ORDER

For these reasons, Plaintiff's motion for summary judgment is **DENIED** (ECF No. 15), Defendant's motion for summary judgment is **GRANTED** (ECF No. 16), and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: September 17, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge